KATHRYN FRANKLIN v. PAUL R. BOARDMAN, doing business as The Boardman Realty Company.

29 So. (2nd) 24                      January Term, 1947
February 4, 1947                       En Banc
Rehearing Denied February 28, 1947.

Harris, Barrett, McGlothlin & Dew, for appellant.
Ed W. Harris, for appellee.

CHAPMAN, J.:

Paul R. Boardman, doing business as The Boardman Realty Company, sued Mrs. Kathryn Franklin for a commission on the sale of designated real estate owned by her and known as Amor Apartments situated in Pinellas County, Florida. The first count of the amended declaration alleged that the defendant orally listed the property with him for sale without fixing any price and agreed to. pay the plaintiff, as a real estate broker, a commission of 5% if he would find a purchaser ready, able and willing to buy it at a price agreeable to the defendant; that the plaintiff, through his salesman, David B. Hull, found a purchaser, to-wit Henry A. Kendall, who was ready, able and willing to purchase the property for the sum of $50,000.00; that the defendant was advised as to the purchaser but refused to sell the property because of a previous exclusive listing given to another realtor; and that the plaintiff performed his agreement with the defendant and was entitled to be paid for his services a commission of 5% of $50,000.00. The second count is for work done and materials furnished by the plaintiff for the defendant at her request. A bill of particulars was attached to the amended declaration.

The defendant filed several pleas to the amended declaration viz.: (1) defendant did not promise as alleged: (2) de-

fendant did not list the property with the plaintiff for sale; (3) defendant did not employ plaintiff to sell the property; (4) defendant did not promise to pay plaintiff a commission; (5) defendant denied that plaintiff produced a purchaser ready, able and willing to buy the property at a suitable price to the defendant; (6) defendant denied that plaintiff found a purchaser ready, able and willing to buy the property for $50,000.00; (7) plaintiff failed to submit a binding offer from Henry A. Kendall to purchase the property at any price; (8) Kendall did not purchase the property; (9) defendant paid the broker who had an exclusive listing a commission for the sale of the property. Other pleas are in the record which in effect denied the material allegations of counts one and two of plaintiff's amended declaration. There was a verdict and judgment for plaintiff below and defendant appealed.

The sole question here presented is the sufficiency of the evidence adduced by the plaintiff to sustain the verdict and judgment entered in the court below and challenged on this appeal. Whether or not the plaintiff below carried the burden of proof and thereby established that he was employed by the defendant to find a purchaser for the Amor Apartments who was ready, able and willing to buy the same at a price and on terms acceptable to the defendant must be determined by a study and careful analysis of all the evidence appearing in the record.

Mr. Hull testified that he was associated with the plaintiff as a salesman and met Mrs. Franklin in December, 1944, and she told him that she "would call me up when I could see her place," which would be after the first of the year (1945). That on March 1, 1945, she called him up and said, "Now my place can be shown and you can list it in your office," "That is what you call a listing, is it?" "Yes, that is right." That he (Hull) took Mr. Kendall to see the apartments, when he introduced him to Mrs. Franklin and her sister, Mrs. Sessoms. "We did not stay long but looked about the apartments when Mr. Kendall remarked that he had a dinner engagement with his fiancee, Miss Japour, and asked me to drive him down to the Florida Theatre Building. Mr. Hull testified that he and Mr. Kendall made a second visit to the

apartments and talked with the defendant and her sister viz.:

"Q. You called her over the phone?

"I called her over the telephone, and when we got there, they had it prepared. We checked that in detail as to income and expenses, and after we checked that, why then Mr. Kendall made a complete tour and inspection of the property, upstairs and outside and everywhere, and visited several vacant rooms to see the furniture and furnishings. And we came down to the living room again and discussed the price, and Mrs. Franklin thought she should get $55,000.00 for it but Mr. Kendall finally made an offer of $50,000.00, and Mrs. Franklin accepted it right there and then, and then Mr. Kendall remarked that he had his fiancee, Miss Japour, coming out to look at the property, and she arrived there shortly. She was introduced to Mrs. Franklin and Mrs. Sessoms and myself. We went through the entire corner lower suite to look at the furniture in the lower rooms, and Mr. Kendall and Miss Japour, his fiancee, discussed the possibility of changing that one and another one into two suites, and from the conversation, I understood that Mr. Kendall was going to live in the front apartment and his father in the rear. It was during Miss Japour's lunch hour that she came out there, and she was in a hurry, so that was about the extent of the conversation, and she drove Mr. Kendall down town, and I stayed to have further conversation with Mrs. Franklin and Mrs. Sessoms, Mrs. Franklin's living room this time, and we all felt, or I thought——

"Mr. McGlothlin: We object to that, if your Honor please.

"The Court: The objection is sustained.

"The Witness: But it looked like a deal——

"Mr. McGlothlin: We object to what it looked like.

"The Court: Objection sustained.

"Mr. Harris: Well, just go ahead and say what was done and said there.

"A. Well, Mrs. Franklin asked me how much commission we were going to charge her since we had the sale, that looked like a sale, so I told her the regular 5%, and then she looked at Mrs. Sessoms and Mrs. Sessoms looked at her, and they

looked back and forth three or four times; they both looked very nervous, and then Mrs. Sessoms finally said to Mrs. Franklin, 'You tell him.' And finally Mrs. Franklin said, 'There is an old crooked real estate man got an exclusive listing on this property, and he is so crooked and done me dirt that I don't want him to have any commission on this deal,' and she said, 'If this contract goes through with Mr. Kendall, it will have to be dated after May 1st, when his exclusive runs out.' And naturally I knew, I was sure Mr. Boardman would not be any party to anything like that. I knew he wouldn't do it, and then she wanted to know where she was going to live after the property was sold, so I took her out and showed her two properties that afternoon, Mrs. Sessoms and Mrs. Franklin, and the very next day they both contacted the owners of those two properties, and got one of those to cheat me out of the commission. She is living in that house right now. I tried to contact Mr. Kendall for about a week after that at Attorney Holland's office in the Florida Theater Building, but without effect. I call Miss Japour, and she would give me no information."

The listing by the owner Franklin was impliedly subject to the subsequent fixing of the price since the listing did not specify this essential. Subject to an exclusive listing with another broker her price was subsequently fixed at $55,000.00 but agreed to sell for $50,000.00 after May 1st. Before May 1st the sale was accomplished through the exclusive listing. This price fixing affair was at one sitting and one transaction. Plaintiff never produced a ready, able and willing buyer before May 1st at $55,000.00 or after May 1st at $50,000.00.

Plaintiff introduced into evidence, over the objection of the defendant, a contract for the sale of Amor Apartments signed by The Wallace Agency, by J. E. Burnham, acknowledging the receipt of $1,000.00 paid by Henry A. Kendall, and Kendall's name was affixed to the contract of purchase. The evidence is uncontradicted to the effect that this contract (Exhibit 2) was prepared by a Mr. Sullivan and that he left it at the law office of H. W. Holland for signature. Sullivan called at the Holland office the following day and it was signed "Henry A. Kendall". The $1,000.00 was not paid by

Henry A. Kendall but by Holland, who signed Henry Kendall's name to the contract of purchase. The money required to close the deal was not supplied by Kendall but by Holland. Plaintiff did not obtain a down payment or binder from Henry A. Kendall on the property, nor was a contract obtained to purchase Amor Apartments signed by Henry A. Kendall, and by plaintiff delivered to the defendant.

An inference deductible from the testimony of Mr. Hull was to the effect that Henry A. Kendall was buying the property and intended to marry and occupy as a home one of these apartments, and color was given to the idea in that his fiancee's name was mentioned and that she went to the apartments at Kendall's request and inspected each of them with a view of living in one of them after marriage. Mr. Henry A. Kendall was not called as a witness by either party.

The testimony of Miss Clementine Japour is not disputed nor contradicted. She testified that she never was Henry A. Kendall's fiancee and was not "engaged to marry him," and:

"Mr. McGlothlin: Q. Did Mr. Henry A. Kendall have any interest in either of these transactions except to permit, if he did permit, or any way have any interest in that, except the use of his name, did he have any financial interest in it?

"A. Oh no, he had none.

"Q. Now, you stated that you know as a fact that Mr. Holland made an effort to see or get his father to put up the money to pay for the property. . . .

"The Witness: Well, Judge, Mr. Kendall, Sr., that is Mr. Kendall's father, called me on the 'phone and told me in Mr. Holland's absence from town, to tell him that he couldn't go through with that deal.

"Mr. McGlothlin: You had that conversation with him personally?

"A. I had that conversation with him personally before he talked with Mr. Holland.

"Q. Was that this particular deal with Mrs. Frankliin?

"A. Yes sir.

"Could he go through it without the assistance of his father?

"A. No Sir.

"Q. On acount of his financial condition?

"A. That is right."

Counsel for defendant below, when the taking of testimony was concluded, moved the court for the entry of an order directing the jury to find a verdict for the defendant on grounds: (1) that no lawful verdict could be returned by the jury in favor of the plaintiff and against the defendant on the evidence as a whole in the case; (2) that the evidence shows conclusively that the prospective purchaser of the property involved, whom plaintiff claims to have produced, did not purchase the property; that he was not a willing purchaser of the property, and that he was not an able prospect or in financial condition to purchase the property and meet the terms of the alleged contract; and that any verdict that the jury might render for any amount would not be lawful and would be set aside by the court. The trial court denied the motion for a directed verdict for the defendant. The sufficiency of the evidence to sustain the verdict was presented to the trial court a second time in a motion for a new trial, which was by the trial court denied.

Our conclusion is, after a careful study and analysis of all the testimony and exhibits appearing in the record, that the plaintiff below failed to establish by competent testimony the material allegations of the amended declaration to the effect that he had produced a purchaser for the property of the defendant and that the purchaser so produced was then ready, willing and able to purchase upon the terms and at the price acceptable to the defendant.

The judgment is reversed and a new trial awarded.

TERRELL and BARNS, JJ., and FABISINSKI, Associate Justice, concur.

THOMAS, C.J., BUFORD and ADAMS, JJ., dissent.

BUFORD, J., dissenting.

I think there is substantial evidence in the record to show that the owner, Mrs. Franklin, on the 1st day of March, 1945, called the brokers' office and advised them that the property, the sale of which is involved in this suit, could then be shown for sale and that he could list it in his office for sale; that

Mr. Hull, the salesman for the broker, thereafter took Mr. Kendall to the apartment and introduced him to Mrs. Franklin. That Mr. Kendall looked over the property and offered to pay Mrs. Franklin $50,000.00 for it; that Mrs. Franklin agreed to accept $50,000.00 for the property; that after the offer was made and accepted Mrs. Franklin told Mr. Hull that the contract for the sale to Mr. Kendall would have to be dated after May 1st because another broker had the exclusive listing of the property until that date; that thereafter, on March 31, 1945, the contract was executed wherein L. L. McMasters agreed to sell and Henry Kendall agreed to buy the property at the price of $47,500.00 and Mrs. Franklin executed an agreement at the bottom of the contract as follows:

"I or we hereby accept the offer and agree to deliver the above described property at the price and upon the term and conditions herein stated and I or we have agreed to pay the above broker for services in negotiating this contract." — that $2,000.00 was paid as a binder by Clementine Japour whom Mr. Kendall had introduced to Mr. Hull and Mrs. Franklin, on the day when he inspected the property, as his fiancee. On the same day, March 31st Henry Kendall made a contract with J. E. Burnham for the purchase and sale of the property whereupon, at the direction of Mr. Kendall's Attorney, deed was made by Mrs. Franklin conveying the property as per the contract between Mr. Kendall and Burnham.

It appears to me that it is immaterial whether Kendall at the time he agreed to pay the $50,000.00 for the property then had the cash sufficient to pay for it. The record shows that afterwards a contract was executed in his name for the purchase of the property at $47,500.00 and that thereupon he executed the contract to sell the property at $55,000.00; whereupon, conveyance was made in accordance with the terms of his contract to sell.

So it is that my conclusion is that when Mrs. Franklin executed the contract to sell the property to Mr. Kendall at less than $50,000.00, and that contract was closed by her conveying the property in accordance with Mr. Kendall's contract of sale, she became bound to pay the broker, Boardman (who was the real estate broker for whom Hull acted)

484

5% of the purchase price which she accepted for the property when she conveyed the property to Mr. Kendall's assignee, and that she got herself into the position of becoming liable to Mr. Boardman by her own act and conduct for which no misconduct or unfair dealing on the part of Boardman was in anywise responsible.

Therefore, I think the judgment should be affirmed.

THOMAS, C. J., and ADAMS, JJ., concur.